LION OIL REFINING COMPANY *v.* SMITH.

4-5686 133 S. W. 2d 895

Opinion delivered December 4, 1939.

*Jeff Davis, J. A. O'Connor, Jr.,* and *B. L. Allen,* for appellant.

*G. W. Lookadoo* and *J. H. Lookadoo,* for appellee.

HOLT, J. Appellee, T. E. Smith, brought this suit in the Clark circuit court to recover $3,000 damages alleged to have been sustained by him when struck and run down by one of appellant's trucks, driven by one of its employees, on July 14, 1938, while appellee was walking along the highway leading to the Shuler oil field in Union county.

He alleged in his complaint that he was walking "on the left side of the road near the edge of said road, as is the customary and proper place for a pedestrian to walk, and while walking on the left side of the road and as near a ditch that was parallel with said road as was possible for him to be, he met a Chevrolet coupe with a pickup back that belonged to the Lion Oil Refining Company, and was being driven by one of the defendant's agents, servants or employees; that as they approached each other, defendant negligently cut across and directly into the plaintiff, striking him and knocking him clear of the road and over into and under a wire fence and injured plaintiff as follows": He then set out the nature and extent of his injuries and sought damages in the sum as indicated above.

Appellant answered, denying every material allegation in the complaint, and in addition pleaded the contributory negligence of appellee.

From a jury verdict of $3,000, and the judgment rendered thereon, comes this appeal.

Two errors are assigned here by appellant: First, that "there was no proof offered upon which the jury was justified in finding that the car which struck the appellee was, at the time, being driven by an agent of the appellant, acting in the course of his employment." We cannot agree to this contention.

The testimony stated in its most favorable light to appellee is to the following effect:

On July 14, 1938, appellee, while returning from the Shuler oil field in Union county, Arkansas, met one of appellant's trucks, and (quoting from his testimony): "A. I was returning back home, coming towards the highway, and I was walking on the left-hand side of the road meeting the traffic, and this car was coming facing me, meeting me and I was walking as far over on the side of the road as I could get without getting off of the road, and he run up pretty close to me and I seen he was going to hit me and I made an effort to get out of the way, but he got me before I could get out of the way. It looked like he taken a swerve like that (indicating)— I didn't know at the time whether he stopped or what happened. Q. Were you on the extreme left-hand side of the highway? A. Yes, sir. Q. Were there any other on-coming cars right there at you? A. Meeting me? Q. Yes. A. No, sir, not that I seen. . . . Q. Do you know whose truck it was? A. Yes, sir. Q. How do you know whose truck it was? A. By the signs and color. Q. What signs were on the truck? A. Well, the truck was an orange colored truck, with a lion on one side of it. Q. Are you accustomed to seeing Lion Oil Refining Company's trucks? A. In the field over there, yes, sir. Q. You are? A. Yes, sir."

He further testified that he had been on that road a number of times before and knew that Lion Oil Refining trucks operated over it.

The testimony further reflects that a Mr. Beasley, his brother and two other men, a Mr. Chastain and a Mr. McCoy, were in a car nearby and saw appellant's truck strike appellee, Smith. Quoting from Beasley's testimony:

"Q. Did you see the wreck or did you see the truck strike Mr. Smith that day? A. Yes, sir. . . . Q. What kind of a truck was it? A. It was an orange truck, a Lion Oil pickup light runabout truck. Q. Did it have signs on it? A. Yes, it had a picture of a lion on it and 'Lion' wrote on it. . . Q. Do you see those trucks almost daily? A. Not right at present, but I did about that time—that was in July and I wasn't doing anything. . . . Q. Did you look to see what was in the body of

this truck that you said had 'Lion' printed on it and the picture of a lion on it? A. It had oil supply stuff— I don't know what was in there except wire cable. Q. Have you worked in the oil field? A. Yes, sir. Q. Did you use wire cable when you worked in the oil field? A. Yes, sir. Q. And they were going into the oil field when this accident happened? A. Into the Shuler field."

Witness Ocie McCoy corroborated Mr. Beasley's testimony, that the truck that hit appellee had a lion's picture on it, some wire cable and wire rope in it, and that the road was about fifty feet wide, and further: "Q. Have you seen a number of Lion Oil Refining Company's trucks? A. Yes, sir. Q. Was this truck the same kind of a truck they use? A. It was the same kind of little truck they haul light material on. Q. It had the same kind of painting and the same signs and everything? A. Yes, sir."

Witness Chastain, who was in the Chevrolet car with McCoy and Beasley, corroborated their testimony.

A Mr. Mills, witness for appellant, who was the general service manager for appellant, testified that he was in charge of the purchasing, and assigning of appellant's trucks to the different departments, and looked after their up-keep. He testified that appellee, Smith, gave him the license number of the truck which he, Smith, claimed struck him, and quoting from his testimony:

"Q. I believe you said Mr. Smith gave you the license number of the truck? A. He did. Q. Did you investigate that? A. I did. Q. Did you find out whose truck that license was on? A. It was a coupe pickup truck driven by Gaffney Williams in the geological department. Q. For the Lion Oil Refining Company? A. For the Lion Oil Refining Company. . . Q. How many trucks did you say you had going from El Dorado to the Shuler Field? A. What kind? Q. Coupe pickup trucks? A. We have seven. Q. Did they go to the Shuler field almost every day? A. Practically."

He further testified that some of appellant's pickup trucks went down to the Shuler field on the 14th day

of July, 1938, the day on which appellee claims to have been injured, and further:

"Q. Were you drilling down there at that time? A. We were. Q. Did you use cables and wiring of that kind in the drilling and operation of those wells down there? A. The contractors do. Q. Did your trucks carry such material as that from El Dorado out there to the wells? A. Yes. Q. And when they would carry it out there, they were working for the Lion Oil Refining Company, weren't they? A. Yes. . . Q. But they did haul wire cable down there? A. They hauled sand line. Q. Did any of your contractors operate Lion Oil Refining Company's trucks—that is, the ones with a lion's picture on them and the name 'Lion' on them? A. No, sir. Q. All of those trucks operated in that vicinity were trucks of the Lion Oil Refining Company? A. That had the Lion Oil Refining Company insignia on it."

It will thus be seen from this evidence that on July 14, 1938, the day the testimony shows appellee was struck by one of appellant's trucks, at least seven of appellant's trucks similar to the one in question passed over the road on which appellee was walking. They were painted yellow with a lion's head and the word "Lion" printed on each. They carried wire and cable down to the Shuler field similar to that carried on the truck that struck appellee.

Appellee took the license number of the truck which struck him, gave this number to appellant's general service manager, Mills, and upon investigation Mills ascertained that one of appellant's trucks, fitting the description given by appellee and his witnesses, carried this particular license number and was actually driven along the road in question by Gaffney Williams, an employee of appellant, on the day in question, July 14, 1938.

Appellant did not offer Gaffney Williams, this truck driver, as a witness nor any of its other truck drivers to contradict appellee's testimony.

On this state of the record it is our view that the evidence is ample to support the finding that the truck in question was the property of appellant and was being driven and operated by one of its employees in

the master's business, and that the instant case is controlled by the recent case of *Plunkett-Jarrell Grocer Company* v. *Freeman,* 192 Ark. 380, 92 S. W. 2d 849. In fact we think the testimony, in the instant case, is stronger in favor of appellee, than that in the Plunkett-Jarrell case. In that case this court said:

"In the instant case the evidence shows that the appellant owns 42 trucks, and 16 places of business; that it constantly delivers merchandise in those trucks, using the highways; that the truck was the kind of truck used by appellant, and had appellant's name printed on the door. There is no evidence that any other person or company used trucks like this to deliver merchandise in that section of the country. As said in the case just cited, it was a question of fact for the jury, and was sufficient evidence to establish the ownership of the appellant, and that it was being operated by its employee at the time of the accident. . .

"(And further, quoting from *Arkansas Baking Company* v. *Wyman,* 185 Ark. 310, 47 S. W. 2d 45): 'It is next insisted that there is no sufficient showing that the truck that caused the accident was appellant's property, was being used at the time of the accident in its business, or that the driver of the truck was in its employ, and that he was engaged in the business of appellant at the time of the accident. It is undisputed that the truck that caused the accident had appellant's name printed or painted thereon. It is further undisputed that this truck or a like truck bearing the name of appellant, traveled over this highway daily. The evidence further shows that a short time prior to the accident, while appellee and another were in Warren, they saw this same truck and the same driver who caused the accident, delivering bread or other articles of merchandise to a customer in Warren.' . . .

"The court held that this evidence was sufficient to establish the fact that the truck belonged to the appellant, and that it was being operated at the time of the accident by its employee, and that this was sufficient to raise the inference that at the time of the accident he

was acting within the scope of his employment, and in the furtherance of his master's business. . .

"Appellee calls attention to many authorities, all holding that in cases where there is no direct evidence as to who was the owner of the truck, but where the evidence shows that the truck bore the name of the defendant company, was a business truck, and engaged in the character of business that appellant was engaged in, that this is sufficient to establish not only that the defendants were the owners of the trucks, but it was also then in charge of their servant or employee. We do not discuss these cases because we think this court has settled this question beyond controversy."

In *Mullins* v. *Ritchie Grocer Company*, 183 Ark. 218, 35 S. W. 2d 1010, the late Chief Justice HART, speaking for this court on rehearing, said:

"The presumption with which we are dealing in the present case is not a legal presumption, but is an inference or presumption of fact. Its existence is called into being by proof introduced on the subject and not by any statute dealing with the question. This being so, the opposing evidence must be weighed by the jury for the reason that under art. 7, § 23, of our Constitution, the jury is the judge of the facts proved. The rule is stated in 6 Labatt on Master and Servant, (2d ed.), § 2281A, as follows: " 'A servant may be presumed *prima facie* to have been acting in the course of his employment, wherever it appears, not only that his master was the owner of the given instrumentality, but also that, at the time when the alleged tort was committed, it was being used under conditions resembling those which normally attended its use in connection with the master's business.' "

In *Ferris* v. *Sterling*, 214 N. Y. 249, 108 N. E. 406, Ann. Cas. 1916D, 1161, where plaintiff was struck by an automobile being driven by defendant's son and the proof showed that the license number of the car was in the name of the defendant, the court, speaking through Justice CARDOZA, said: "The license number of the car, coupled with evidence that the defendant held the license, was *prima facie* proof that the defendant was the owner.

It was more than that; it was *prima facie* proof that the custodian of the car was then engaged in the owner's service. *Norris* v. *Kohler*, 41 N. Y. 42; *McCann* v. *Davison*, 145 App. Div. 522, 130 N. Y. Supp. 473; *Gulliver* v. *Blauvelt*, 14 App. Div. 523, 43 N. Y. Supp. 935; *Vonderhorst Brewing Co.* v. *Amrhine*, 98 Md. 406, 56 Atl. 833; *Knust* v. *Bullock*, 59 Wash. 141; 109 Pac. 329. 'The property being proved to belong to the defendant, . . . a presumption arises that it was in use for his benefit, and on his own account.' *Norris* v. *Kohler, supra.* This presumption was not destroyed, as a matter of law, by the testimony for the .defendant. Even though his explanation of ·the use of the car would absolve him if credited, the question whether it should be credited was one of fact for the jury.''

It is next contended that ''no proof was offered tending to show any breach of duty owed by the appellant to the. appellee and, consequently, no negligence on the part of the appellant was established.'' Again we cannot agree.

On this assignment we think little need be said. It is our view that the evidence as reflected by the record is sufficient to take the case to the jury on the question of negligence of appellant and contributory negligence of appellee, and that its finding is supported by substantial testimony.

With reference to the relative rights of a pedestrian and the driver of an automobile on our streets and highways, this court in *Millsaps* v. *Brogdon*, 97 Ark. 469, 134 S. W. 632, 32 L. R. A., N. S., 1177, said: ''Each is bound to the exercise of ordinary care for his own safety and the prevention of injury to others in the use thereof. *Hot Springs Street Rd. Co.* v. *Hildreth,* 72 Ark. 572, 82 S. W. 245; *Hannigan* v. *Wright,* 5 Penn. 537, 63 Atl. 234; *Simeone* v. *Lindsay,* 6 Penn. 224, 65 Atl. 778.

''Negligence and contributory negligence are matters to be proved, and the burden is on the one alleging injury from negligence to establish it, unless it is shown by the plaintiff's testimony. *Hot Springs Street Rd. Co.* v. *Hildreth, supra.*''

In the case of *Morel* v. *Lee,* 182 Ark. 985, 33 S W. 2d 1110, this court said:

". . . The law of the case has been well settled in the several decisions of this court defining the relative rights and reciprocal duties of persons using the public streets and highways as pedestrians or in operation of automobiles and other cars or vehicles thereon, each being bound to the exercise of ordinary care for his own safety and the prevention of injury to others in the use thereof. *Millsaps* v. *Brogdon,* 97 Ark. 469, 134 S. W. 632, 32 L. R. A., N. S., 1177; *Minor* v. *Mapes,* 102 Ark. 351, 114 S. W. 219, 39 L. R. A., N. S., 214; *Butler* v. *Cabe,* 116 Ark. 26, 171 S. W. 1190, L. R. A., N. S., 1915C, 702; *Texas Motor Company* v. *Buffington,* 134 Ark. 320, 203 S. W. 1013; *Oliphant* v. *Hamm,* 167 Ark. 167, 267 S. W. 563; *Snow* v. *Riggs,* 172 Ark. 835, 290 S. W. 591; *Gates* v. *Plummer,* 173 Ark. 27, 291 S. W. 816; *Murphy* v. *Clayton,* 179 Ark. 225, 15 S. W. 2d 391.

"Ordinary care, however, is a relative term, its interpretation depending upon the facts and circumstances of each particular case; and, although drivers of automobiles and pedestrians both have the right to the use of the streets, the former must anticipate the presence of the latter and exercise reasonable care to avoid injuring them, care commensurate with the danger reasonably to be anticipated. *Minor* v. *Mapes, supra; Snow* v. *Riggs, supra; Texas Motor Company* v. *Buffington, supra;* and *Murphy* v. *Clayton, supra.*"

Upon careful examination, we find no error in the instructions.

On the whole case we conclude that the judgment should be affirmed, and it is so ordered.